## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| **HOUNDS TOWN – ATLANTA-CONYERS and AMANDA MCDOWELL,** | **Case No.:** |
| | **Jury Trial Demanded** |
| **Individually and on behalf of all others similarly situated,** | |
| **Plaintiffs,** | |
| **v.** | |
| **BIO-LAB, INC., a Delaware Corporation, and KIK CUSTOM PRODUCTS INC., a Delaware Corporation,** | |
| **Defendants.** | |

## <u>CLASS ACTION COMPLAINT AND JURY DEMAND</u>

Plaintiffs Hounds Town – Atlanta-Conyers and Amanda McDowell, individually and on behalf of putative classes of all others similarly situated ("Class Members" or "Classes"), sue Defendants Bio-Lab, Inc. ("Bio-Lab"), and KIK Custom Products Inc. ("KIK," and together with Bio-Lab, "Defendants"), and based on personal knowledge, investigation of counsel, and review of public documents and information, allege as follows:

## INTRODUCTION

1.      This Consolidated Class Action seeks redress for residents living or working and businesses operating in proximity to Defendants' chemical production facility in Rockdale County, Georgia (the "Facility").

2.      Bio-Lab packages and sells pool and spa chemicals under brands including BioGuard, SpaGuard, Spa Essentials, Natural Chemistry, SeaKlear, and AquaPill.

3.      In the early morning of September 29, 2024, a fire broke out in the Facility after water from a "malfunctioning sprinkler head 'came in contact with a water reactive chemical.'"[1]

4.      The fire and a resulting days-long chemical reaction caused a plume of smoke laden with toxic chemicals to rise from the Facility (the "Plume"). The Plume contaminated the air in Rockdale County, across the Atlanta metro area and surrounding counties, and exposed Plaintiffs to massive amounts of toxic chemicals, including chlorine gas, bromine vapor, hydrochloric acid, hydrogen cyanide, hydrogen bromide, phosgene gas, and other volatile and semi-volatile compound byproducts.

---

[1] https://www.cnn.com/2024/09/29/us/rockdale-county-biolab-fire-georgia/index.html

5.    The fire and resulting Plume necessitated a mandatory evacuation of surrounding residents, and emergency orders to shelter in place, remain indoors, and caused the shut-down of local businesses.

6.    As a result of the Facility fire and the impact of the Plume and Defendants' actions afterwards, the Classes have all suffered, among other things, loss of use and enjoyment of property, property damage, exposure to toxic material, inconvenience, disruption, loss of business revenues, and economic damages as alleged more specifically below.

## THE PARTIES

7.    At all relevant times, Plaintiff Amanda McDowell was an adult citizen of Georgia and occupies the real property located at 1036 Hewlett St, Conyers GA 30012, within two miles of the Facility and resulting Plume.

8.    As a result of Defendants' negligent, careless, and/or reckless conduct in connection with the September 29, 2024, chemical fire and resulting Plume, Plaintiff Amanda McDowell and her one-year old child have suffered damages, including, but not limited to, an increased risk of disease from exposure to and inhalation of toxic chemicals, contamination of her property by egregiously high and plainly dangerous levels of toxic chemicals dispersed by Defendants into the air and water, and the loss of use and enjoyment of her property and resulting inconvenience, disruption, and emotional distress.

9.     Plaintiff Amanda McDowell seeks to represent the Residents Class, as defined below.

10.     At all relevant times, Plaintiff Hounds Town – Atlanta-Conyers is a business located at 1381 Iris Drive SE, Conyers, GA 30013, within four miles of the Facility and resulting Plume. Hounds Town – Atlanta-Conyers is owned and operated by Susan Vander Meer, an adult citizen of Georgia. The business is a provider of interactive dog daycare, overnight boarding, and grooming services.

11.     As a result of Defendants' negligent, careless, and/or reckless conduct in connection with the September 29, 2024, chemical fire and resulting Plume, Plaintiff Hounds Town – Atlanta-Conyers has suffered damages, including loss of use and enjoyment of property, and lost revenue. Plaintiff Hounds Town – Atlanta-Conyers, which was in the shelter-in-place zone, has lost approximately one-quarter of its revenues over multiple days following the fire and resulting Plume.

12.     Plaintiff Hounds Town – Atlanta-Conyers seeks to represent the Businesses Class as defined below.

13.     Defendant Bio-Lab is a Delaware corporation with its principal office located at 101 MacIntosh Boulevard, Concord, Ontario, L4K4R5 and its headquarters located at 1725 N. Brown Road Lawrenceville, Georgia 30043.

14.     Defendant Bio-Lab is licensed to do business in the State of Georgia and conducts business in several counties in the State of Georgia, including Gwinnett and Rockdale Counties.

15.     Defendant KIK is a Delaware corporation with its principal place of business located at 101 MacIntosh Boulevard, Concord, Ontario, L4K4R5.

16.     Defendant KIK is one of North America's largest independent manufacturers of consumer products.

17.     Defendant KIK plays a controlling role in decisions regarding the operations of Bio-Lab, which packages and sells swimming pool and spa water care products as well as specialty chemicals.[2]

18.     Defendant Bio-Lab is a wholly owned subsidiary of KIK.

19.     Bio-Lab describes itself as the "swimming pool and spa water care division of KIK Consumer Products."[3]

20.     KIK acquired Bio-Lab in 2013 to "expand[] its pool and spa treatment business within the United States, Canada, Europe, South Africa, Australia and New Zealand."[4]

---

[2] https://www.biolabinc.com/
[3] https://www.biolabinc.com/
[4] https://www.kikcorp.com/our-products/

21.    KIK and Bio-Lab operate out of the same corporate headquarters and the Chief Executive Officer, Chief Financial Officer, Executive Vice President, and General Counsel of KIK share the same or similar positions at Bio-Lab.

22.    At all relevant times, KIK and Bio-Lab acted individually, as well as by and through one another and their respective officers, directors, executives, employees, contractors, subcontractors, and/or agents.

23.    KIK and Bio-Lab are jointly and severally liable for conduct alleged herein because they acted in concert and under alter ego and piercing the corporate veil theories, including based on the domination and /or control by KIK and the interlocking and overlapping officers and directors.

## JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction over the claims asserted in this action under 28 U.S.C. § 1332 because there is complete diversity between Defendants and at least one member of the Classes; there are more than one hundred members of each Class; and the amount in controversy exceeds $5,000,000.00 exclusive of interest and costs.

25.    This Court has personal jurisdiction over Defendants because they regularly engage in business within the state of Georgia, including the manufacturing, selling, using and transporting of hazardous materials, and these causes of action arise, in part, from the same, and because the claims asserted

herein arise from the business activities and tortious conduct of Defendants within the state of Georgia prior to and at the time of the Facility fire.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in the Northern District of Georgia, Plaintiffs and all Class Members were injured because of tortious activity in this District.

## FACTUAL ALLEGATIONS

27.     The Facility opened in 1973.

28.     The Facility is located at 1700 Covington Hwy, Conyers, GA 30012.

29.     Among other operations, the site receives, blends, and packages Trichloroisocyanuric Acid ("TCCA") as well as Sodium Bromide and BromoChloroDiMethylHydantoin ("BCDMH") into finished consumer products.

30.     TCCA is a chlorinating agent often used for sanitizing swimming pools and hot tubs.

31.     TCCA is a white solid substance stored at the BioLab facility and is available as a powder, compacted tablets, and granules.

32.     At any given moment, the Facility can contain hundreds of thousands of pounds of TCCA. These are often packaged in 2750 pound "super sacks" stacked on warehouse floors.

33.     When TCAA "comes into contact with small amounts of water and does not dissolve, it can undergo a chemical reaction that generates heat, causing the decomposition of TCCA, which produces toxic chlorine gas"[5] and other toxic byproducts.

34.     Chlorine gas is a toxic substance immediately dangerous to life or health if inhaled.

35.     It is well known that TCCA reacts with water to create toxic and hazardous gases and produces enough heat to cause self-ignition and ignite other nearby combustibles.

36.     As described in detail below, Defendants' negligent, careless, and/or reckless handling of TCCA has caused numerous prior explosions and mass casualty events.

I.      *The September 29, 2024, fire and Subsequent Release of the Plume*

37.     On Sunday, September 29, 2024, at approximately 5:30 a.m., a fire suppression sprinkler at the Facility activated, spraying water onto chemicals inside the plant, including TCCA, and causing a chemical reaction that sparked a conflagration.

38.     The fire caused the roof of the Facility to collapse.

---

[5] https://www.csb.gov/us-chemical-safety-board-releases-final-report-into-2020-toxic-gas-release-and-chemical-fire-at-bio-lab-facility-in-westlake-la/

39.     Firefighters were initially unable to contain the fire due to the presence of water reactive chemicals, including TCCA, but were forced to use water to extinguish the fire.

40.     Rockdale County, Georgia, where the Facility is located, issued the first alert related to this chemical fire and toxic chemical Plume at approximately 10:45 a.m.; this alert asked "[a]ll churches from Rockbridge to the Northside County Line" to cancel all church services for the day and disperse any services in session.[6]

41.     Shortly after, at 11:00 a.m., Rockdale County asked announced several road closures in the area, as discussed in more detail below.

42.     The fire was contained by 12:00 p.m., but then reignited while workers were attempting to contain the reactive chemicals in the Facility, causing a massive plume of smoke to billow from the Facility.

43.     At approximately 1:10 p.m. that same day, as discussed in more detail below, Rockdale County authorities issued an Evacuation Order to residents of Rockdale County

44.     The second fire was extinguished around 4:00 p.m. on September 24, 2024.

---

[6] https://www.rockdalecountyga.gov/updates-on-bio-fire-9-29-24/

45.    The fire caused a "complete collapse" of the Facility building, including the internal chemical storage structure.

46.    Because the internal chemical storage structure collapsed, the toxic chemicals kept at the Facility are no longer removable by pallet; rather, they are mixed among the rubble and continue to off-gas toxic chemicals.

47.    Bio-Lab did not have an adequate fire protection system to quickly and effectively extinguish fires at the Facility and avoid dangerous chemical reactions with water-reactive chemicals.

48.    Bio-Lab's failure to possess and utilize an effective fire protection system exacerbated the harm caused by the fire at the Facility and delayed the emergency response to the fire.

49.    Smoke produced by ongoing uncontrolled chemical reactions inside the Facility billowed in a massive red, orange, and green plume for days after the



fire was extinguished.

*Figure 1: Toxic Chemical Plume from Facility*

50.     The Plume contained toxic chemicals such as chlorine, hydrochloric acid, hydrogen cyanide, hydrogen bromide, and phosgene.

51.     The State of Georgia sent officials from the Georgia Environmental Protection Division ("EPD") to respond and assess the air quality after the fire from the Facility.

52.     The U.S. Environmental Protection Agency ("EPA") also assisted in air quality monitoring and assessment, and the Federal Emergency Management Agency was called to respond and assist in emergency management as well.

53.     The EPD and the EPA conducted air quality surveys on September 29 and 30, 2024, and the results indicated that chlorine, a harmful irritant, was being emitted from the Facility; the EPD and EPA continue to test for chlorine and other toxic chemicals as of the date of the filing of this Complaint.

54.     Wind patterns made the Plume follow an unpredictable path, causing hazardous chemicals to stream throughout the surrounding communities, including Rockdale, Gwinnett, DeKalb, Newton, and Fulton Counties.

55.     Emergency management authorities issued three types of orders or advisories to particular affected persons who were also within a 50-mile radius of the Facility depending on where they were located in relation to the Facility; the

three types of orders or advisories include evacuation orders, shelter-in-place

orders, and shelter-in-place advisories.

56.    Authorities in Rockdale County, Georgia issued an evacuation order at

approximately 1:10 p.m. on September 29, 2024, asking Rockdale County

residents living near the Facility to evacuate immediately

57.    This evacuation order impacted over 17,000 people, who were

displaced from their homes.



*Figure 2: A Map of the Evacuation Zone*

58.    At approximately 7:45 p.m. on September 29, 2024, all 90,000

residents of Rockdale County, an area of 132 square miles, were ordered to shelter

in place and turn off all air conditioners and ventilation systems to the toxic air

outside.

59.    This shelter-in-place order was subsequently extended and continued through October 7, 2024, from 7:00 p.m. to 7:00 a.m.

60.    Relatedly, all businesses in Rockdale County were instructed to close their operations during the duration of the Rockdale County shelter-in-place order.

61.    Rockdale County authorities also announced the closing of major transportation routes, including an eight-mile stretch of Interstate 20 between Salem Road and Turner Hill; Highway 138 to Interstate 20 from Turner Hill Road to Salem Road; and southbound traffic on Hi-Roc Road between Irwin Bridge and Highway 138.

62.    As a result of these closures, evacuated residents were unable to return to their homes to obtain personal items and necessities, including medication, precious items, and phones.

63.    Residents have no idea how long the air in their homes will remain poisonous to breathe, or how long these orders will remain in effect.

64.    Debris from the decomposition and combustion is strewn throughout Rockdale County. This debris and toxic fallout will contain numerous harmful chemical byproducts of the explosions and require soil and property testing and cleanup.

65.    Outside of Rockdale County, residents in surrounding counties were advised to stay indoors ("stay-indoors advisories").

66.     Georgia Emergency Management Agency and Homeland Security
Agency ("GEMA") issued stay-indoors advisories to affected areas, and residents,
from Rockdale County, Walton County, Gwinnett County, DeKalb County, Fayette
County, Newton County, and Fulton County who were also within a 50-mile radius
of the Facility.



*Figure 3: Map Issued By GEMA Showing Shelter-in-place advisories*

67.    Defendants' negligence, carelessness, and/or recklessness has upended the lives Plaintiffs and of nearly 100,000 Georgians, who must now fear for their health and the habitability of their neighborhoods. Despite repeated warnings that their conduct would cause catastrophic consequences, Defendants refused to behave responsibly. Now an entire county must bear the costs.

68.    Plaintiffs and their families have been exposed to these toxic chemicals, and are suffering from significant difficulty breathing, burning and watering eyes, bronchitis, headache, dizziness and lightheadedness, nasal irritation, fatigue, and severe emotional distress.

69.    Plaintiffs and the Class Members were abruptly ordered to evacuate their homes and shutter their businesses several hours after the Facility fire began emitting the Plume throughout their community.

70.    Plaintiffs and the Class Members have incurred relocation and response costs and continue to do so.

71.    Plaintiffs and the Class Members also own businesses and/or work in the area and have been unable to work or derive income during the catastrophe or have lost income due to business disruptions directly caused by the fire and Plume.

72.    Plaintiffs bring this action on behalf of themselves and the putative classes to ensure that Defendants pay for their negligence, carelessness, and/or

recklessness, and account for the consequences that Defendants have imposed on this community

II.  *Hazardous Chemicals Released*

73.    The following are the hazardous chemicals and combustion products detected or likely to be detected within a 30-mile radius of the Facility following the fire, along with the health and environmental effects associated with each. These chemicals are harmful to humans, as well as livestock, plants, and crops. These chemicals may cause a direct effect on livestock, plants, and crops, as well as an indirect effect on the food supply.

a.  *Chlorine / Hydrogen Chloride / Hydrochloric Acid*

74.    Chlorine is a yellow-green gas at room temperature. It is an extremely reactive element and a strong oxidizing agent.

75.    Chlorine gas is toxic, as it attacks the respiratory system, eyes, and skin. Chlorine reacts with water in the mucosa of the lungs to form hydrochloric acid, destructive to living tissue and potentially lethal. Chlorine gas was first used as a weapon in World War I.

76.    Chlorine can be smelled at concentrations as low as 3 ppm. Coming into contact with chlorine is extremely dangerous at concentrations as low as 10 ppm. Chlorine causes coughing and vomiting at 30 ppm, lung damage at 60 ppm, and death in a short time after exposure to 1000 ppm. The Occupational Safety and

Health Administration's permissible exposure limit for chlorine is 1 ppm. The National Institute for Occupational Safety and Health's recommended exposure limit is 0.5 ppm over 15 minutes.

77.    Exposure to chlorine gas causes effects ranging from bronchitis, asthma, and swelling of the lungs, to headaches, heart disease, and meningitis. Acute exposure causes more severe respiratory and lung effects and can result in fatalities. An EPA review of a 2-year chronic inhalation study showed that even the lowest exposures resulted in measurable cell destruction, primarily as pulmonary lesions.

78.    Chlorine is heavier than air and therefore settles near ground level, staying present in the area around the Facility and taking more time to dissipate.

79.    Hydrogen chloride is produced by a reaction between chlorine gas and hydrogen. It is a colorless, corrosive gas.

80.    Hydrogen chloride is irritating and corrosive to any tissue it contacts. Brief exposure to low levels causes throat irritation. Exposure to higher levels can result in rapid breathing, narrowing of the bronchioles, blue coloring of the skin, accumulation of fluid in the lungs, and even death. Exposure to even higher levels can cause swelling and spasm of the throat and suffocation.

81.    One may develop an inflammatory reaction following exposure to hydrogen chloride. This condition is called reactive airways dysfunction syndrome,

a type of asthma caused by some irritating or corrosive substances. Depending on the concentration, hydrogen chloride can produce conditions from mild irritation to severe burns of the eyes and skin.

82.    Hydrogen chloride forms hydrochloric acid when it encounters water vapor in the air, causing white fumes to appear. Hydrochloric acid is a colorless solution with a distinctive pungent smell and is classified as a strong acid.

83.    Long-term exposure to low levels of hydrochloric acid can cause respiratory problems, eye and skin irritation, and discoloration of the teeth.

   b. *Bromine / Hydrogen Bromide*

84.    Bromine is a volatile red-brown liquid at room temperature that evaporates readily to form a similarly colored vapor. It has a strong, pungent odor.

85.    Bromine is considered toxic and corrosive to human skin and tissues, with properties similar to chlorine but slightly less reactive. Inhaling bromine gas results in similar irritation of the respiratory tract, causing coughing, choking, shortness of breath, and death if inhaled in large enough amounts. Chronic exposure may lead to frequent bronchial infections and a general deterioration of health.

86.    Bromine gas will react with hydrogen gas to form hydrogen bromide. A colorless gas, hydrogen bromide can dissolve in water to form hydrobromic acid.

87.    Hydrogen bromide is highly corrosive and, if inhaled, can cause lung damage.

### c. Hydrogen cyanide

88.    Hydrogen cyanide is a colorless or pale-blue liquid or gas with a bitter, almond-like odor used in fumigation, electroplating, mining, and chemical synthesis.

89.    Hydrogen cyanide interferes with the human body's use of oxygen and can negatively impact the brain, heart, blood vessels, and lungs.

### d. Phosgene

90.    Phosgene gas was used as a chemical warfare agent during World War I and is banned by the 1925 Geneva Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous. or Other Gases, and of Bacteriological Methods of Warfare.

91.    Exposure to phosgene gas can cause eye and throat irritation. High amounts in the air can cause severe lung damage. Exposure can occur through inhalation, dermal contact, or ingestion.

92.    Higher levels of phosgene can cause lungs to swell, making it difficult to breathe. Even higher levels can result in severe lung damage that might lead to death. Dermal contact with phosgene can result in chemical burns or may cause frostbite.

III.    *Bio-Lab's History of fires, Chemical Leaks, and Safety Violations*

93.    Bio-Lab has a long history of fires and chemical leaks causing mass exposure to toxic chemicals.

94.    **July 2, 2024, Westlake, LA**: A fire caused by a chemical reaction occurred at Bio-Lab's Lake Charles, Louisiana facility, resulting in the closure of a portion of Interstate 10 and a shelter-in-place order for nearby residents.[7]

95.    **March 23, 2023, Westlake, LA**: A chlorine gas leak at the same Louisiana facility caused a cloud over the city of Westlake for hours. People within a mile of the Bio-Lab plant were ordered to shelter in place for at least three hours and state police shut down both lanes of nearby Interstate 10.[8]

96.    **September 14, 2020, Conyers, GA**: A "thermal decomposition event" in the Facility caused a chlorine vapor cloud to be released into the air.[9]

97.    A water line in the Facility leaked, covering most of the floor in a building where unpackaged TCCA was also stored.

98.    The TCCA reacted with the water and released toxic fumes. Nine firefighters were hospitalized after inhaling toxic vapors.

---

[7] https://www.serviceindustrynews.net/2024/07/31/biolab-suffers-chemical-incident-possible-fire/
[8] https://www.nola.com/news/environment/latest-toxic-gas-release-causes-fear-anger-in-lake-charles/article_8e10fef0-c9ae-11ed-b7a9-e76ae5e0c8c5.html
[9] https://www.csb.gov/bio-lab-conyers-chemical-release-/

99.     As a result, Interstate 20 was closed for more than six hours and nearby businesses evacuated and residents were encouraged to shelter in place.[10]

100.    **September 18, 2020**, **Conyers, GA**: A trailer containing TCCA caught on fire at the Facility.

101.    **August 27, 2020, Westlake, LA**: Rainwater from Hurricane Laura contacted TCAA stored inside the Louisiana facility, "initiating a chemical reaction and subsequent decomposition. The heat initiated a fire.

102.    A large plume of hazardous gases, including toxic chlorine, traveled from the Louisiana facility.

103.    A portion of nearby Interstate 10 was closed for over 28 hours, and local officials issued a shelter-in-place order for the surrounding community due to the release of hazardous gases."[11]

104.    The U.S. Chemical Safety & Hazard Investigation Board ("CSB") investigated the fire and issued a report identifying several safety issues that contributed to the incident, including Bio-Lab's delayed response, failure to adhere to existing National Fire Protection Association's codes for high-hazard industry occupancies, and failure to prepare for extreme weather events.[12]

---

[10] https://www.ajc.com/news/business/chlorine-product-maker-biolab-has-history-of-fires-and-chemical-leaks/ET4CU6BAVVD55C2BMLTT7PQ2TY/

[11] https://www.csb.gov/us-chemical-safety-board-releases-final-report-into-2020-toxic-gas-release-and-chemical-fire-at-bio-lab-facility-in-westlake-la/

[12] *Id.*

105.    The CSB found that "Bio-Lab experienced serious delays in its response to the TCCA decomposition and fire (roughly five and a half hours), due to an inadequate and largely nonfunctional fire protection system and the absence of automated extinguishing systems."

106.    Further, "[t]his significant delay in responding to the decomposition likely led to an unnecessary increase in (1) the amount of TCCA that decomposed, (2) the quantity of toxic chlorine released, and (3) the extent of the facility damage."

107.    The CSB also found that "Bio-Lab did not adequately maintain its fire protection system to protect against fire hazards and ensure its functionality during an emergency."

108.    The CSB determined that Bio-Lab's inadequate preparation for extreme weather and Bio-Lab's deficient process hazard analysis action item management system contributed to the incident.

109.    The CSB further determined that Bio-Lab's inadequate and largely nonfunctional fire protection system and the absence of automatic extinguishing systems contributed to the severity of the incident.

110.    The CSB ultimately provided Bio-Lab with four recommendations to prevent and respond to future similar incidents: (1) Evaluate hazards posed by extreme weather events and implement processes and safeguards for protection

against such events; (2) Develop and implement an improved Process Hazard

Analysis action item management system; (3) Perform process hazard analyses on

all buildings and units processing or storing TCAA and keep such analyses up to

date; and (4) Create an appropriate emergency response plan.

111.    In other words, more than four years prior to the September 29, 2024,

Facility fire and Plume, the CSB alerted Bio-Lab of the need to be up to code and

prepare for and deal with severe weather's effect on its operations and storage of

hazardous chemicals.

112.    Bio-Lab failed to heed this warning: the surrounding area was

pounded with a record breaking, 11 inches of rain in 48 hours from severe weather

caused by Hurricane Helene in the days prior to the fire.

113.    **June 4, 2016, Conyers, GA:** A Georgia Environmental Protection

Agency division complaint reports that the chemical decomposition of TCAA

began releasing smoke at the Facility. The Rockdale County fire Department

responded and handled the incident.[13]

114.    **May 25, 2004, Conyers, GA:** A fire broke out in a Facility warehouse

that contained about 12.5 million pounds of pool chemicals and oxidizers, resulting

in a large toxic plume that necessitated the evacuation of thousands of residents

and the shutdown of Interstate 20 for several hours. The fire released massive

---

[13] https://cts.gaepd.org/Complaint/79996

amounts of chlorine and hydrochloric acid into the air. Hydrogen cyanide, hydrogen bromide and phosgene were also released. "The effect of the plume was felt more than 50 miles away,"[14] including causing a "sizable fish kill" in a nearby lake two days after the fire.[15]

115.   Additionally, in February 2024, Georgia environmental regulators issued a notice of violation to Bio-Lab after inspectors uncovered several violations during an inspection in the previous month. "During the January inspection, the report said regulators found multiple improperly sealed and unlabeled hazardous waste containers on site. Used oil tanks and buckets were left uncovered, and inspectors noted that the company had not been performing its required weekly self-inspections. 'Multiple areas in the facility... showed a neglect of facility maintenance to the point of creating potential safety hazards. It is advised that the facility take some action to address this issue,' inspectors wrote."[16]

116.   The Occupational Safety and Health Administration has also fined Bio-Lab tens of thousands of dollars for repeated safety violations stretching back

---

[14]https://www.epaosc.org/site/site_profile.aspx?site_id=A4EY&fbclid=IwZXh0bgNhZW0CMT
EAAR0aHIYmLKx3Hh5cMER6YEnVELjDsfOfbhpt_3zxwMDsdVcZGjlAamJOw2Y_aem_73
5jupFJcA56GVw6xtzUUg

[15] https://www.ajc.com/news/business/chlorine-product-maker-biolab-has-history-of-fires-and-chemical-leaks/ET4CU6BAVVD55C2BMLTT7PQ2TY/

[16] https://www.ajc.com/news/business/chlorine-product-maker-biolab-has-history-of-fires-and-chemical-leaks/ET4CU6BAVVD55C2BMLTT7PQ2TY/

to 2015. In 2019, for example, the company was fined $6,000 for failing to provide "effective information and training" on hazardous chemicals—including chlorine.[17]

117.    In spite of this series of catastrophes and fires, Defendants have stubbornly refused to take proper precautions with their volatile and hazardous chemicals to prevent another eminently predictable—and preventable—toxic chemical reaction.

## CLASS ACTION ALLEGATIONS

118.    Plaintiffs seek relief on behalf of themselves and as representatives of all others who are similarly situated. Pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), (b)(3) and (c)(4). Plaintiffs seek certification of two proposed Classes defined as follows:

**The Residents Class:**
All individuals who resided, owned property, or worked within a 30-mile radius of the Facility on September 29, 2024 ("the Class Zone"), and were subject to the evacuation orders, shelter-in-place orders, and/or shelter-in-place advisories issued as a result of the September 29, 2024, Facility fire.

**The Businesses Class:**
All individuals or legal entities who owned or operated a business within the Class Zone on September 29, 2024, and whose businesses were subject to the evacuation orders, shelter-in-place orders, and/or shelter-in-place advisories issued as a result of the September 29, 2024, Facility fire.

---

[17] https://www.ajc.com/news/business/chlorine-product-maker-biolab-has-history-of-fires-and-chemical-leaks/ET4CU6BAVVD55C2BMLTT7PQ2TY/

119.   Excluded from the Classes are: (1) Defendants and any of their affiliates, parents or subsidiaries; all employees of Defendants; all persons who make a timely election to be excluded from the Classes; and the judges assigned to this case, their immediate families, and court staff; and (2) insurers and insurance syndicates whose claims for damages regarding the September 29, 2024, fire and resulting toxic chemical Plume, arise out of a right of subrogation, whether equitable, contractual, or otherwise.

120.   Also excluded from the Classes are any claims for physical manifestation of personal or bodily injury.

121.   Plaintiffs hereby reserve the right to amend or modify the Class definitions with greater specificity or division after having had an opportunity to conduct additional investigation and discovery.

122.   The proposed Classes meet the criteria for certification under 23(a), 23(b)(2), and/or 23(b)(3).

123.   The amount in controversy exceeds $5,000,000.00 exclusive of interest and costs.

**Numerosity and Ascertainability**

124.   This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). The members of the Classes are so numerous that the joinder of all members is impractical.

125.   While the exact number of Class Members is unknown to Plaintiffs at this time, it is ascertainable; the proposed Classes include thousands of residents and businesses who were unlawfully exposed to toxic chemicals or who had property contaminated by unlawful exposure to toxic chemicals and suffered damages. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

**Predominance of Common Issues**

126.   This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because this action involves common questions of law or fact that predominate over questions affecting only individual Class Members.

127.   The common questions include, without limitation, the following:

a.   Whether Defendants' acts or omissions as set forth herein caused or contributed to the Facility fire, subsequent release of toxic chemicals and Plume, and the resulting contamination and evacuation and/or "shelter in place" orders;

b.   Whether Defendants breached their duty of reasonable care in the storage of hazardous chemicals in the Facility;

c.   Whether Defendants are strictly liable for injuries and damages suffered by Plaintiffs and the Class because Defendants

engaged in abnormally dangerous and/or ultrahazardous activity by storing hazardous substances;

d.  Whether Defendants' violated nuisance law by emitting air contaminants and/or endangering the health, safety, or welfare of the public, causing unreasonable injury or damage to property;

e.  Whether Defendants committed trespass on the property of Plaintiffs and the Classes by their acts and omissions, including by causing hazardous materials to enter and contaminate said property;

f.  Whether Defendants committed trespass to the chattels of Plaintiffs and the Classes through their acts and omissions, including by impairing the property as to its condition, quality, or value; depriving Plaintiffs and the Classes of the possession or use of their chattels for a substantial time; or causing harm to the property;

g.  Whether Defendants' acts and omissions after the fire caused or contributed to losses and damages sustained by Plaintiffs and the Classes;

h.  Whether the Plaintiffs and the Classes have suffered a loss of use and enjoyment of property, property damage, diminution of property value, extra expenses or other economic damages as a result of the Defendants' acts or omissions as set forth above;

i.  Whether Defendants' conduct constitutes gross negligence or willful and wanton conduct, including related to the fire and subsequent release of toxic and hazardous substances;

j.  Whether Defendants' actions constitute negligence per se;

k.  Whether medical monitoring is an appropriate remedy that should be imposed to provide early detection of future injuries and other benefits to Plaintiffs and the Classes;

l.  Whether monitoring of the diminution in value of the property of Plaintiffs and the Classes is an appropriate remedy; and

m.  Whether Plaintiffs and the Classes are entitled to relief for the damages caused by Defendants.

**<u>Typicality</u>**

128.  This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the Class Members and arise from the same course of conduct by Defendants.

129.   Plaintiffs own property, reside in, work, and/or operate a business within the Class Zone surrounding the Facility and toxic chemical fire, and owned property, resided, worked, and/or operated a business in the Class Zone for at all relevant times.

130.   Plaintiffs' claims are based upon the same legal theories as those of the other Class Members.

131.   Plaintiffs and the other Class Members sustained damages as a direct and proximate result of the same wrongful acts or omissions in which Defendants engaged.

132.   Plaintiffs' damages and injuries are akin to those of Class Members, and Plaintiffs seek relief consistent with the relief of Class Members.

**Adequacy**

133.   This action satisfies the requirements of Fed. R. Civ. P. 23(a)(4) because Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs have retained counsel with substantial experience in prosecuting complex class action and environmental toxic tort litigation, including successful class actions involving mass displacements caused by the release of dangerous substances that are similar to that at issue here. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class

Members and have the financial resources to do so. Neither Plaintiffs nor their counsel has interests adverse to those of the Class Members.

134.   Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the interests of Class Members.

**<u>Superiority and Predominance</u>**

135.   This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient group-wide adjudication of this controversy. The common questions of law and of fact regarding Defendants' conduct predominate over any questions affecting only individual Class Members.

136.   Because the damages suffered by certain individual Class Members may be relatively small, the expense and burden of individual litigation would make it very difficult for all individual Class Members to redress the wrongs done to each of them individually, such that many Class Members would have no rational economic interest in individually controlling the prosecution of specific actions. Moreover, the burden imposed on the judicial system by individual litigation by even a small fraction of the Classes would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

137.   The prosecution of this case as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties'

resources, and far more effectively protects the rights of each Class Member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the Court, and the public, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

138.    Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority, discretion, and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

**MEDICAL MONITORING CLASS INJUNCTIVE RELIEF PURSUANT TO RULE 23(b)(2)**
**(On Behalf of Plaintiff McDowell and the Residents Class)**

139.   In addition, Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(2). Defendants have acted and/or failed to act on grounds generally applicable to Plaintiff and the Residents Class and that require court imposition of uniform relief, thereby making appropriate equitable relief to the Residents Class as a whole within the meaning of Rule 23(b)(2).

140.   As set forth above, Plaintiffs are not asserting damages claims for the physical manifestation of a current toxicity injury, and have no adequate remedy at law, rendering declaratory, injunctive, and other equitable relief appropriate.

141.   Plaintiff McDowell and the Residents Class seek equitable relief in the form of a medical monitoring program and establishment of a medical monitoring fund, and further request injunctive relief compelling Defendants to finance the medical monitoring program and address issues as they develop during program administration.

142.   As a direct and proximate result of Defendants' wrongful conduct as set forth above, Plaintiff and the Residents Class Members have actually been exposed, and will continue to be exposed, to toxic substances and toxic fumes and thereby suffer, and will continue to suffer, a significantly increased risk of serious injury and diseases as alleged herein, including lung disease such as asthma and permanent lung damage. This increased risk is such that a reasonable physician

would order medical monitoring, including but not limited to periodic diagnostic medical testing and necessary examinations.

143.    Early detection and treatment of diseases and conditions at-issue here are associated with more favorable outcomes. Timely-instituted medical monitoring will reduce the risk of illness and of more severe illness by using medical tests to detect who has been affected by exposure to vinyl chloride and other toxic substances released by the fire, and to provide medical intervention that will prevent or reduce the deterioration and long-term health and well-being of Plaintiff and the Residents Class she seeks to represent. Medical monitoring and testing procedures, including clinical examinations, exist that make the early detection of exposure to those toxic substances and toxic fumes that were released into the class area as a result of the fire and toxic Plume, as well as early detection of disease, both feasible and beneficial.

144.    The increased susceptibility to injuries and irreparable threat to the health of the Plaintiff and the Residents Class Members resulting from their exposure to toxic substances can be appropriately mitigated and addressed only by the creation of a comprehensive medical monitoring program, supervised by the Court, and funded by the Defendants, that: (a) notifies individuals who have been exposed to toxic substances of the potential harm from such exposure and the need for periodic testing and examination; (b) provides early detection and treatment of

disease and injuries caused by exposure to toxic substances; and (c) gathers and forwards to treating physicians information related to the diagnosis and treatment of injuries and diseases which may result from exposure to toxic substances.

145.   Establishment of a Court-supervised medical monitoring program can readily assure that the proceeds of any monitoring trust fund are reserved for the provision of and/or reimbursement for the above-referenced examination and testing procedures and related activities, guaranteeing the purely equitable use of any trust fund proceeds. The Court's use of its injunctive powers to oversee and direct medical monitoring in this case is an appropriate and necessary method of adjudication.

146.   The precise nature, form, extent and duration of Court-ordered diagnostic monitoring, clinical examinations, research activities, and education programs are a matter for the Court to decide, after hearing and consultation with medical, industrial, modeling, and other experts. Class adjudication of the right to this relief is both appropriate and necessary.

147.   The medical monitoring program should (a) be generally supervised by the Court and may be directly managed by Court-appointed, Court-supervised special masters or trustees; (b) involve the monitoring of all Residents Class Members by designated physicians under a Court-approved medical treatment and research regiment; and (c) involve the collection of medical data utilized for group

studies, as well as monitoring and treatment of individuals. During program administration, Defendants should address issues implicated by program administration as they develop.

## COUNT I

### NEGLIGENCE
### (On Behalf of the Classes Against All Defendants)

148.   Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

149.   The fire, subsequent uncontrolled chemical reaction, and Plume of toxic chemicals was caused by the negligence, carelessness, and/or recklessness of the Defendants.

150.   Upon information and belief, Plaintiffs aver that the fire, uncontrolled reaction, and Plume of toxic chemicals was caused by the joint negligence, carelessness, and/or recklessness of the Defendants, and is the fault of the Defendants as set forth above.

151.   In addition, and in the alternative, the fire, uncontrolled reaction, and Plume of toxic chemicals was caused by defective, unfit, and/or unsafe equipment, which was in the care, custody and control of Defendants. Defendants knew or should have known of the dangerous, unfit, and/or defective condition of this equipment and are therefore liable for the equipment.

152.    Defendants owed and breached a duty of reasonable care commensurate with the risk of using, manufacturing, storing, and processing hazardous and toxic chemicals, including TCCA and other water-reactive chemicals, in the Facility. Defendants' duties include, but are not limited to:

a.  Prevent a fire from occurring on September 29, 2024, at the Facility;

b.  Build, maintain, repair, or otherwise prepare the Facility to prevent severe weather from causing dangerous chemical reactions;

c.  Ensure chemicals were not compromised or released as a result of extreme weather events;

d.  Follow the guidance presented in the Center for Chemical Process Safety Monograph Assessment of and Planning for Natural Hazards;

e.  Maintain sufficient regulatory coverage of chemicals with reactive hazards;

f.  Develop and implement a sufficient Process Hazard Analysis action item management system;

g.  Properly and safely store chemicals at the Facility;

h.  Prevent dangerous chemical reactions between water and chemicals at the Facility;

i.  Store, handle, maintain, process or otherwise use chemicals at the Facility in order to prevent fires;

j.  Maintain adequate fire prevention, protection, and/or suppression systems at the Facility;

k.  Maintain emergency and fire protection equipment to ensure it was in good working order prior to severe weather;

l.  Avoid causing a fire on September 29, 2024, at the Facility;

m.  Promptly extinguish the fire on September 29, 2024, at the Facility;

n.  Avoid causing continuous chemical fires on September 29, 2024;

o.  Avoid creating a toxic chemical Plume as a result of the fires, that spread throughout the proposed Class Zone;

p.  Avoid contaminating the air in the proposed Class Zone;

q.  Maintain their toxic chemicals in such a way that fire could not destroy the internal chemical storage structure at the Facility;

r.  Create or enforce policies that would prevent fires from occurring at the Facility;

s.  Require or follow reasonable safety measures to prevent or mitigate fires at the Facility;

t.  Maintain their premises in a safe condition so as to prevent fires;

u.  Properly supervise and train personnel to prevent fires;

v.  Properly inspect fire suppression systems, chemical storage, or condition of the Facility to prevent fires;

w.  Warn Plaintiff and proposed Class members of the long-term health risks and consequences of exposure to high levels of chlorine gas and other toxic chemicals;

x.  Sufficiently address the September 29, 2024, fire in a way that would reduce injury and damage to the proposed Class members;

y.  Prevent the fires and resulting toxic chemical Plume through further actions or inactions revealed in discovery;

z.  Prevent exposing Plaintiff and the proposed Classes to continuous off-gassing of toxic chemicals even after the fire was extinguished;

aa. Avoid creating or exacerbating circumstances at the Facility that would necessitate evacuation orders, shelter-in-place orders and/or shelter-in-place advisories; and

bb. Conduct their operations in a safe manner,

153.    However, inconsistent with federal regulations and industry practice and procedures, Defendants negligently, carelessly, and/or recklessly breached their duties to Plaintiffs and the Classes in at least the following respects:

a.  Failing to prevent a fire from occurring on September 29, 2024, at the Facility;

b.  Failing to build, maintain, repair, or otherwise prepare the Facility to prevent severe weather from causing dangerous chemical reactions;

c.  Failing to ensure chemicals were not compromised or released as a result of extreme weather events;

d.  Failing to follow the guidance presented in the Center for Chemical Process Safety Monograph Assessment of and Planning for Natural Hazards;

e.  Failing to maintain sufficient regulatory coverage of chemicals with reactive hazards;

f.   Failing to develop and implement a sufficient Process Hazard Analysis action item management system;

g.   Failing to properly and safely store chemicals at the Facility;

h.   Failing to prevent dangerous chemical reactions between water and chemicals at the Facility;

i.   Failure to store, handle, maintain, or otherwise use chemicals at the Facility in order to prevent fires;

j.   Failing to maintain adequate fire prevention, protection and/or suppression systems at the Facility;

k.   Failure to maintain emergency and fire protection equipment to ensure it was in good working order prior to severe weather;

l.   Causing a fire on September 29, 2024, at the Facility;

m.   Failing to promptly extinguish the fire on September 29, 2024, at the Facility;

n.   Causing continuous chemical fires on September 29, 2024;

o.   Creating a toxic chemical Plume, as a result of the fires, that spread throughout the proposed Class Zone;

p.   Contaminating the air in the proposed Class Zone;

q.   Maintaining their toxic chemicals in such a way that the fire destroyed the internal chemical storage structure at the Facility;

r.  Exposing Plaintiff and the proposed Classes to continuous off-gassing of toxic chemicals even after the fire was extinguished;

s.  Creating or exacerbating circumstances at the Facility that necessitated evacuation orders, shelter-in-place orders and shelter-in-place advisories;

t.  Failing to conduct their operations in a safe manner;

u.  Failing to create or enforce policies that would prevent fires from occurring at the Facility;

v.  Failing to require or follow reasonable safety measures to prevent or mitigate fires at the Facility;

w.  Failing to maintain their premises in a safe condition so as to prevent fires;

x.  Failing to properly supervise and train personnel to prevent fires;

y.  Failing to properly inspect fire suppression systems, chemical storage, or condition of the premises to prevent fires;

z.  Failure to warn Plaintiff and proposed Class members of the long-term health risks and consequences of exposure to high levels of chlorine gas and other toxic chemicals;

aa. Failure to sufficiently address the September 29, 2024, fire in a way that would reduce injury and damage to the proposed Class members; and

bb. Failing to prevent the fire and resulting toxic chemical Plume through further actions or inactions revealed in discovery.

154. Given the likelihood of contamination to neighboring residential areas and exposing residents to toxic substances, Defendants had a duty to investigate the extent to which the burn of hazardous materials and byproducts would contaminate property at levels that would materially increase nearby residents' likelihood and risk of developing inflammation and diseases.

155. The damages to Plaintiffs and Class Members were also caused by or aggravated by the fact that Defendants failed to take necessary actions following the fire to mitigate the danger and harm associated with their operations.

156. As a direct and proximate result of Defendants' negligent use, emission, discharge, disposal, distribution, and release of hazardous materials throughout the Class Zone surrounding the Facility, Plaintiffs and Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, and loss of use and enjoyment.

Additionally, Plaintiff McDowell and members of the Residents Class suffer an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

157.   Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

158.   Plaintiffs' and Class Members' damages include the need for remediation and continued, periodic testing of their livestock and/or pets to ensure early detection of any disease or illness in the animals as a result of the contamination and exposure to contaminants, and byproducts they experienced as a result of Defendants' activities alleged herein.

159.   Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, recklessness, and/or a conscious indifference to the circumstances and an entire want of care sufficient to warrant the imposition of punitive damages.

## COUNT II

### STRICT LIABILITY
### (On Behalf of the Classes Against All Defendants)

160.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

161.    Defendants are strictly liable for the injuries and damages suffered by Plaintiffs and the Classes pursuant to the provisions of the Restatement (Second) of Torts §§ 519 and 520.

162.    The storage of the toxic and flammable substance TCCA (and the other dangerous chemicals stored in the Facility) is an abnormally dangerous and/or ultrahazardous activity under the definition set forth in Restatement (Second) of Torts §§ 519 and 520.

163.    The Defendants engaged in an abnormally dangerous and/or ultrahazardous activity by storing hazardous substances, including but not limited to TCCA, near a residential community, making them strictly liable for any resulting damages.

164.    As a direct and proximate result of the Defendants' abnormally dangerous and/or ultrahazardous activity, Plaintiffs and Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience, and loss of use and enjoyment. Additionally, Plaintiff McDowell and members of the Residents Class suffer an increased risk of

associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

165.   Plaintiffs' and the Class Members' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe. Water must be periodically tested to ensure it is safe to drink, to provide to livestock and pets, and to use for watering crops. Soil must be periodically tested to ensure that it is safe for people, livestock, and pets to occupy, and safe for grazing livestock and growing crops.

166.   Accordingly, the Defendants are strictly liable, jointly and severally, without regard to fault, for all of the damages to Plaintiffs and the Class Members, which were a direct and proximate result of the fire and release of hazardous substances which harmed Plaintiffs and the Classes as described above.

167.   Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, recklessness, and/or a conscious indifference to the circumstances and an entire want of care sufficient to warrant the imposition of punitive damages.

## COUNT III

### PRIVATE NUISANCE
### (On Behalf of the Classes Against All Defendants)

168.   Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

169.   Through their improper actions resulting in the September 29, 2024, fire and toxic chemical Plume, Defendants caused hurt, inconvenience, and damage to Plaintiffs and proposed Class members.

170.   Defendants invaded Plaintiffs' and Class Members' interest in their property, including their interest in the use and enjoyment of their property, causing nuisance.

171.   The nuisance is such that it would affect an ordinary, reasonable man.

172.   Following the chemical fire and resulting toxic chemical Plume, Plaintiffs and Class members were exposed to a continuous nuisance as the toxic chemical Plume invaded their property.

173.   Defendants caused the creation, continuance, and maintenance of the nuisance.

174.   The nuisance was in Defendants' control.

175.   Defendants knew or should have known that their conduct would cause nuisance to Plaintiffs and the proposed Classes.

176.   Defendants did not remedy the nuisance in a reasonable time.

177.   As a result of Defendants' conduct and resulting nuisance, Plaintiffs and proposed Class members suffered injury and damages.

178.   Plaintiffs' and Class members' injuries and damages are a direct and proximate result of Defendants' conduct leading to the September 29, 2024, chemical fire and toxic chemical Plume, and the resulting nuisance.

179.   Plaintiffs' and Class members' injures and damages include, but are not limited to, hurt, inconvenience, loss of use and enjoyment of property, loss of right to enjoy possession of their property, discomfort, disrupted peace of mind, unhappiness, annoyance, costs of repair, restoration, and remediation of property, lost trees and growth, the depreciation or reduction in their property's market, usable, or rental value, the loss or depreciation of property or business value, loss of business income, loss of business goodwill, evacuation and relocation expenses, out of pocket expenses, and other economic damages as recoverable by law.

180.   Plaintiffs' and the Classes' damages include the need for remediation and continued, periodic testing of their water, soil, and crops to ensure they are safe.

181.   Punitive damages should be imposed in an amount sufficient to punish, penalize, or deter Defendants from repeating similar conduct.

## COUNT IV

### PUBLIC NUISANCE
### (On Behalf of the Classes Against All Defendants)

182.   Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

183.   Through its actions resulting in the September 29, 2024, chemical fire and toxic chemical Plume, Defendants caused hurt, inconvenience, and damage to Plaintiffs and proposed Class members.

184.   Through their improper actions, and the resulting spread of a toxic chemical Plume, Defendants invaded Plaintiffs' interest in property, including their interest in the use and enjoyment of their property, causing nuisance.

185.   The nuisance damaged all those within the sphere of its operation.

186.   The nuisance obstructed or caused inconvenience to the public in the exercise of rights common to all.

187.   The nuisance is such that it would affect an ordinary, reasonable man.

188.   Following the chemical fire and resulting toxic chemical Plume, Plaintiffs and Class members were exposed to a continuous nuisance as the toxic chemical Plume invaded their properties.

189.   Defendants caused the creation, continuance, and maintenance of the nuisance.

190.   The nuisance was in Defendants' control.

191.   Defendants knew or should have known that their conduct would cause nuisance to Plaintiffs and the Classes.

192.   Defendants did not prevent or remedy the nuisance in a reasonable time.

193.   As a result of Defendants' conduct and resulting nuisance, Plaintiffs and the Classes suffered injury and special damages.

194.   Plaintiffs' and the Class members' injuries and special damages are a direct and proximate result of Defendants' conduct leading to the September 29, 2024, chemical fire and toxic chemical Plume, and the resulting nuisance.

195.   Plaintiffs' and the Class members' special damages and injures include, but are not limited to, their hurt, inconvenience, loss of use and enjoyment of property, loss of right to enjoy possession of their property, discomfort, disrupted peace of mind, unhappiness, annoyance, costs of repair, restoration, and remediation of property, lost trees and growth, the depreciation or reduction in their property's market, usable, or rental value, the loss or depreciation of property or business value, loss of business income, loss of business goodwill, evacuation and relocation expenses, out of pocket expenses, and other economic damages as recoverable by law.

196.   Plaintiffs' and the Classes' damages include the need for remediation and continued, periodic testing of their water, soil, crops, and air to ensure they are safe.

197.   Punitive damages should be imposed in an amount sufficient to punish, penalize, or deter Defendants from repeating similar conduct.

**COUNT V**

## TRESPASS TO LAND AND CHATTEL
**(On Behalf of the Classes Against All Defendants)**

198.   Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

199.   Defendants caused harmful quantities of chlorine and other hazardous chemicals to be released from the Facility and to enter upon the homes, land, soil, and water of the Plaintiffs and Class Members.

200.   Harmful quantities of chlorine and other hazardous chemicals entered the Plaintiffs and Class Members' homes, land, soil, water, and breathing air.

201.   Defendants knew, or should have known, that such discharges would enter onto Plaintiffs' and Class Members' properties.

202.   Plaintiffs and Class Members never sanctioned, permitted, or authorized any invasion of their properties of the chlorine and other hazardous chemicals released by Defendants from the Facility.

203.   The invasion, presence, and spreading of the chlorine and other hazardous chemicals released by Defendants from the Facility unreasonably interferes with the Plaintiffs and Class Members' exclusive right of possession in said properties.

204.   The invasion, presence, and spreading of the chlorine and other hazardous chemicals released by Defendants from the Facility constitutes a continuing abatable trespass by Defendants.

205.    Defendants' trespass and continuing trespass are the actual and proximate cause of property damages, including specifically, the loss of use and enjoyment of their properties, and other response costs, losses, and expenses, and other compensable harm to Plaintiffs and Class Members

## COUNT VI

### MEDICAL MONITORING
**(On Behalf of the Residents Class Against All Defendants)**

206.    Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

207.    As a direct and proximate result of Defendants' acts and/or omissions, Plaintiffs and Residents Class Members face an increased susceptibility to injuries and this irreparable threat to their health can only be mitigated by the creation of a fund to provide for a medical monitoring program, including: funding of a study of the long term effects of exposure to chlorine and other hazardous chemicals, funding a study of the long term effects of chlorine and other hazardous chemicals within the human body, gathering and forwarding to treating physicians information relating to the diagnosis and treatment of injuries which may result from exposure to chlorine and other hazardous chemicals, aiding in the early diagnosis and treatment of resulting injuries, and providing funding for diagnosis and preventable medical treatment.

208.   Plaintiffs and Residents Class Members have no adequate remedy in law in that monetary damages alone do not compensate for the insidious and continuing nature of the harm to them, and only a monitoring program can prevent the greater harms which may not occur immediately and which may be preventable if proper research is conducted and the health risks are diagnosed and treated before they occur or become worse.

209.   Plaintiffs and Residents Class Members have suffered irreparable harm as alleged herein and, in the absence of equitable relief, will suffer further irreparable harm from exposure to chlorine and other hazardous chemicals.

## COUNT VII

### GROSS NEGLIGENCE/WILLFUL AND WANTON CONDUCT
### (On Behalf of the Classes Against All Defendants)

210.   Plaintiffs repeat, reallege, and incorporate by reference the allegations asserted above as if fully set forth herein.

211.   At all times relevant, Defendants owed a duty to refrain from grossly negligent, willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and the Class Members, and an entire want of care.

212.   Upon information and belief, Defendants were, at all times relevant, aware that the chemicals stored in the Facility, including but not limited to TCCA, Sodium Bromide, and BCDMH, were dangerous and toxic chemicals and that

these compounds, when burned, aerosolized, decomposed, and otherwise released, are mutagenic and/or otherwise harmful to humans.

213.   Upon information and belief, Defendants were, at all times relevant, aware of the considerable health risks associated with the release of such compounds into the air, water, and land, including the risk of causing various diseases and inflammation in the surrounding population.

214.   Upon information and belief, Defendants were, at all times relevant, aware that their storage and release of such compounds could result in the unreasonably dangerous emission of hazardous materials into the surrounding communities.

215.   Upon information and belief, Defendants were, at all times relevant, aware that the Facility was in violation of applicable regulations and industry practice and procedures and otherwise failed to secure such compounds before the fire occurred.

216.   Notwithstanding this actual knowledge, and inconsistent with federal regulations and industry practice and procedures, Defendants breached their duties

217.   Defendants' failures in these and other respects in the face of actual knowledge regarding the risks of unreasonable hazardous material discharge constitute gross negligence, willful, wanton, reckless, and/or outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health,

safety, and well-being of Plaintiffs and the Class Members so as to warrant the imposition of punitive or exemplary damages.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class Members proposed in this Class Action Complaint, respectfully request that the Court enter judgment in their favor and against each Defendant as follows:

a.  For an Order certifying the Classes, as defined herein, and appointing Plaintiffs and their Counsel to represent the Classes;

b.  For damages, including compensatory, punitive, and exemplary damages, in an amount determined just and reasonable;

c.  For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

d.  For prejudgment and post-judgment interest on all amounts awarded;

e.  For injunctive and declaratory relief, as allowed by law, including medical monitoring; and

f.  Such other and further relief as this Court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs demand a jury trial on all issues so triable.

Dated: October 11, 2024                    Respectfully submitted,

                                           By: */s/ Kyle G.A. Wallace*
                                           Kyle G.A. Wallace
                                           Georgia Bar No. 734167
                                           **Shiver Hamilton Campbell, LLC**
                                           3490 Piedmont Road, Suite 640
                                           Atlanta, Georgia 30305
                                           Phone: (404) 593-0020

                                           R. Brian Strickland
                                           Georgia Bar No. 500789
                                           **Smith, Welch, Webb & White,
                                           LLC**
                                           2200 Keys Ferry Court
                                           P. O. Box 10
                                           McDonough, Georgia 30253
                                           bstrickland@smithwelchlaw.com
                                           (770) 957-3937

                                           Nicholas A. Migliaccio*
                                           Jason S. Rathod*
                                           Bryan Faubus*
                                           **Migliaccio & Rathod LLP**
                                           412 H St NE
                                           Washington D.C. 20002
                                           Telephone: (202) 470-3520
                                           Facsimile: (202) 800-2730
                                           nmigliaccio@classlawdc.com
                                           jrathod@classlawdc.com
                                           bfaubus@classlawdc.com

                                           Jeffrey S. Goldenberg*
                                           Todd B. Naylor*
                                           Robert B. Sherwood*
                                           **Goldenberg Schneider, L.P.A.**
                                           4445 Lake Forest Drive, Suite 490
                                           Cincinnati, Ohio 45242
                                           Tel: 513.345.8297
                                           jgoldenberg@gs-legal.com

tnaylor@gs-legal.com
rsherwood@gs-legal.com

Charles E. Schaffer*
Daniel Levin*
Nicholas J. Elia*
**Levin Sedran & Berman LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106 Tel: (215) 5⁹
1500 cschaffer@lfsblaw.com
dlevin@lfsblaw.com
nelia@lfsblaw.com


*pro hac vice* application
forthcoming

*Attorneys for Plaintiffs*